IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

v.              CRIMINAL ACTION NO. 2:09-cr-00222-37

KIRK NORMAN DEAN,

      Defendant.

**MEMORANDUM OPINION AND ORDER**

  Before the Court are Defendant Kirk Norman Dean's Motion to Suppress Evidence [Docket 872] and Supplemental Motion to Suppress [Docket 1255].

*I. BACKGROUND*

  Defendant Kirk Norman Dean is among fifty-five members and associates of the Pagans Motorcycle Club (PMC) charged in a twenty-nine-count superseding indictment. Defendant is named in Counts Twelve and Nineteen, which respectively charge him with threatening to commit a crime of violence in aid of racketeering in violation of 18 U.S.C. § 1959(a)(4) and conspiring to carry a firearm while employed by a prohibited person in violation of 18 U.S.C. § 922(h) and § 371.

  Defendant's motions seek to suppress evidence seized on three occasions. Defendant first requests the suppression of any evidence taken from Defendant's computer by a confidential informant who was cooperating with the Government at the time the evidence was taken. The Government represented at a hearing held March 29, 2010, that several photographs were the only evidence obtained from the computer. The Government conceded on the record that it did not intend

to introduce any of the photographs into evidence. A copy of one photograph recovered from the computer may be introduced at trial but the copy was obtained from an independent source. Accordingly, Defendant acknowledges that this suppression request is moot.

The two other suppression requests concern evidence obtained from Defendant's home during the execution of a search warrant and evidence obtained from Defendant's girlfriend, Johnna Lathey, when she was called to testify before a federal grand jury. These requests remain live issues. They will be discussed in greater detail below.

## II.  DISCUSSION

### A.  Evidence from Search of Defendant's Home

The Fourth Amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV. This right restrains the power of law enforcement officers to conduct searches of places in which a person has a "legitimate expectation of privacy." *Rakas v. Illinois*, 439 U.S. 128, 143 (1978) (citing *Katz v. United States*, 389 U.S. 347, 351 (1967)). A person has a limited but nonetheless legitimate expectation of privacy for the interior of his automobile. *See Cardwell v. Lewis*, 417 U.S. 583, 590–91 (1974). A warrantless search of the interior of a person's automobile is per se unreasonable unless the search falls within a valid exception. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). The Government bears the burden of proving that one of the valid exceptions applies to the circumstances. *See United States v. Jeffers*, 342 U.S. 48, 51 (1951); *United States v. Gwinn*, 219 F.3d 326, 335 (4th Cir. 2000); *United States v. Morrow*, 731 F.2d 233, 235–36 (4th Cir. 1984). In this case, the Government relies on the voluntary consent warrant exception.

Law enforcement officers do not need a warrant to conduct a search if the subject of the search waives his Fourth Amendment rights by voluntarily consenting to the search. *See Schneckloth*, 412 U.S. at 227; *Ferguson v. City of Charleston*, 308 F.3d 380, 296 (4th Cir. 2002). To constitute a valid warrant exception, the suspect's consent must have been given voluntarily, meaning that it was not obtained by official intimidation, harassment, or by any other form of improper coercion. *Florida v. Bostick*, 501 U.S. 429, 438 (1991); *see also Schneckloth*, 412 U.S. at 225. The voluntariness of the consent is determined by taking account of the totality of the circumstances. *United States v. Mendenhall*, 446 U.S. 544, 557 (1980); *United States v. Watson*, 423 U.S. 411, 424 (1976). Signed written consent forms are evidence that a search was voluntary. *United States v. Boone*, 245 F.3d 352, 362 (4th Cir. 2001). Without more, the fact that the suspect was in custody does not make his consent involuntary. *Watson*, 423 U.S. 424.

The permissible scope of consensual searches is objective reasonableness: "[W]hat would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). Suspects have the right to place limits on the scope of warrantless searches based on consent. *United States v. Coleman*, 588 F.3d 816, 820 (4th Cir. 2009). A search that exceeds the expressed scope of the suspect's consent is unreasonable. *United States v. Neely*, 564 F.3d 346, 349–51 (4th Cir. 2009) (holding that suspect's consent to search of his car's trunk did not permit search of passenger compartment). If no limits are expressly placed on the search, the inquiry is whether the search was consistent with what a reasonable person would have understood to be the within the scope of the suspect's consent under the circumstances. *See United States v. Gonzalez*, 222 F. App'x 238, 246 (4th Cir. 2007) (unpublished). Unless expressly limited, consent-based searches of automobiles generally include any location or container in which the object

of the search might be found. For instance, if the suspect gives an officer generalized consent to search a car for narcotics, it would be reasonable for the officer to look into a paper bag found on the floor of the car. *Jimeno*, 500 U.S. at 251.

Defendant seeks to suppress evidence seized when the agents executed a search warrant of his residence on October 6, 2009. Specifically, Defendant wishes to suppress photographs taken from a chest in the living room of his home and axe handles taken from his vehicle. The Government conceded that it does not intend to introduce the photographs into evidence, which moots that portion of Defendant's suppression motion. The axe handles were found in Defendant's vehicle. It is undisputed that the vehicle was not covered by the search warrant. The law enforcement officers executing the search warrant obtained written consent forms from Defendant and Lathey to search the vehicle. Defendant argues that the consent was not given voluntarily and, even if it was voluntary, that the search exceeded the scope of his consent. The testimony and evidence produced at the hearing do not bear out these assertions, however.

Most of the events that occurred on the morning in question are undisputed. Approximately ten law enforcement officers arrived at Defendant's home around 6:00 a.m. They knocked on the front door and announced their identity. Lathey testified that Defendant woke her up. She recalled that the officers' vehicles' flashing blue lights were visible outside the bedroom window. Defendant went to answer the door, according to Lathey, because "he didn't want them to bust the door."[1]

The officers at the door had their guns drawn. Defendant opened the door, and officers immediately ordered him to the ground. ATF Special Agent Wesley Brent Price holstered his gun and cuffed Defendant with his hands behind his back. Special Agent Price remained with Defendant

---

[1] Quotations of testimony from the March 29 hearing are drawn from the court reporter's rough draft of the transcript.

while the others conducted a sweep of the home with their guns still drawn. The officers found Lathey in a bedroom or stepping out of a bedroom. Lathey stated that an officer pointed a gun at her head as he approached. She was brought to the living room of the home where she was placed on the couch next to Defendant. Lathey was not handcuffed. The officers secured their firearms in their holsters when the initial sweep was complete. No guns were drawn for the remainder of the time the officers were conducting the search. ATF Special Agent Jesse Hooker estimated that the officers' guns were drawn no longer than "a minute or two."

Special Agent Price remained in the living room with Defendant and Lathey while the other officers conducted the search. Due to Defendant's demeanor, which the officers described as calm, collected, and non-threatening, his handcuffs were moved to a more comfortable position in front of his body. Special Agent Price described the atmosphere as calm, and recalled that they engaged in light conversation on topics such as Defendant's business and Lathey's dog. Special Agent Hooker called the atmosphere in the home "cordial" and "subdued." Apart from the initial entry, Lathey described the officers' conduct for the remainder of the search, which lasted several hours, as "respectful," "nice," and "professional."

Within the first twenty or so minutes of the search, Special Agent Price asked Defendant if there were any drugs or firearms in the home. Defendant responded that he had a permitted firearm in his truck which was parked outside the residence. Special Agent Price asked Defendant if the officers could search the truck. Consistent with usual practice, Special Agent Price testified that he asked if they could search the vehicle generally, without limiting the request in any manner. Special Agent Hooker, who was present during the exchange, did not recall any limits being placed on the scope of the search. Defendant orally consented to the search. He testified that at the time he felt he

"had nothing to hide" and that he believed that the officers would obtain a warrant if he refused. He did not recall expressing any limitations on the scope of the search. Defendant did testify, however, that he believed that he was consenting to the retrieval of the firearm from his truck and nothing more. Special Agent Price inquired as to the location of the keys. Defendant responded by pointing to the kitchen area where the keys were hanging on a rack on the wall. Special Agent Hooker retrieved the keys and proceeded outside.

It is undisputed that Defendant and Lathey each signed consent forms for the vehicle search. It is unclear exactly when the written consent forms were signed, however. Although the testimony was somewhat inconsistent, it appears that Defendant signed the form after giving oral consent but prior to the search and Lathey signed the form afterwards, when it was discovered that the vehicle was titled in her name in addition to Defendant's. No testimony described the contents of the consent forms, which apparently were misplaced by the ATF after the search.

Special Agent Hooker and another officer unlocked the truck and began to search. First, the firearm was found in a compartment under the center console. They next found a concealed weapons permit and the vehicle's registration. The officers continued to search. One of the officers lifted the backseat. Underneath they found two axe handles with PMC insignia on them. The axe handles were seized.

The largely undisputed events leading up to Defendant's consent to search the truck do not suggest that his consent was involuntary. Undoubtedly, the initial entry of the officers with their guns drawn was traumatic for Defendant and Lathey. However, the voluntariness of consent must be reviewed under the totality of the circumstances. After the tense initial sweep of the residence, the testimony of Special Agent Price, Special Agent Hooker, Lathey, and Defendant all indicate that the

6

atmosphere was relaxed. It was during this time, with Defendant and Lathey sitting on their couch engaging in small talk with the officers, that Special Agent Price requested consent to search the vehicle. No weapons were drawn and no threats were made. Consent was given orally and in writing. The fact that Defendant was in custody and handcuffed is of little consequence. Defendant testified that he believed the officers would have obtained a warrant to search the truck if he withheld consent. This admission suggests that Defendant understood he could have refused the request. The Court finds that Defendant's consent was given voluntarily.

The evidence produced at the hearing demonstrates that the officers' search did not unreasonably exceed the scope of Defendant's consent. Special Agent Price testified that he requested to search the truck in general terms without limitation. He and Special Agent Hooker did not recall Defendant placing any limitations on his consent to the search of the truck. Defendant's testimony on this issue was consistent with the officers. It is plausible that Defendant subjectively believed that he was consenting only to the retrieval of the gun from his truck, but the officers did not limit their request to search and he did not expressly limit his consent. He had no reason to do so. Defendant admitted that he thought he had nothing to hide. The permissible scope of a search based on consent is determined by objective reasonableness. The Court finds that the officers reasonably believed that Defendant consented to a general search of his truck, which would include the area under the back seat where the axe handles were found.

    *B. Evidence Obtained During Grand Jury Testimony*

The investigatory powers of grand juries are subject to few constraints and only limited judicial oversight. *United States v. Calandra*, 414 U.S. 338, 342-43 (1974). However, it is a "universal rule that prosecutors cannot utilize the grand jury solely or even primarily for the purpose of gathering

evidence in pending litigation." *United States v. Brothers Constr. Co.*, 219 F.3d 300, 314 (4th Cir. 2000) (quoting *United States v. Moss*, 756 F.2d 329, 332 (4th Cir. 1985)). As this rule involves delving into the subjective intent of prosecutors, it is "difficult, if not impossible to enforce." *In re Grand Jury Subpoena Duces Tecum*, 767 F.2d 26, 30 (2d Cir. 1985).

Grand jury proceedings are entitled to a presumption of regularity. *Id.* A defendant challenging the regularity of the grand jury proceeding bears the heavy burden of rebutting this presumption. *Id.* A defendant under indictment may satisfy this burden by demonstrating that the Government's "sole or dominant purpose" was to use the grand jury's investigatory powers to improperly obtain pretrial discovery. *Moss*, 756 F.2d at 332. This burden is not met if the circumstances evidence that the grand jury's investigation concerned potential additional charges against an indicted defendant, *United States v. Leung*, 40 F.3d 577, 581–82 (2d Cir. 1994), or potential charges against unindicted persons involved in the same criminal activity as an indicted defendant, *United States v. Gibbons*, 607 F.2d 1320, 1328 (10th Cir. 1979). The return of a superseding indictment containing additional charges or additional defendants is strong evidence that the grand jury proceedings were proper. *United States v. Flemmi*, 245 F.3d 24, 29 (1st Cir. 2001). Nevertheless, a continuing grand jury investigation of a defendant subsequent to an indictment is not improper merely because it does not result in additional charges. *United States v. Leung*, 40 F.3d 577, 581–82 (2d Cir. 1994). So long as the grand jury is acting for a lawful purpose, it is immaterial that its investigation uncovers additional evidence against a defendant who is already under indictment. *In re Antitrust Grand Jury Investigation*, 714 F.2d 347, 350 (4th Cir. 1983).

Defendant seeks to suppress photographs that were obtained from Lathey when she testified before a federal grand jury subsequent to the original indictment. Defendant contends that the grand jury was convened for the improper purpose of conducting pretrial discovery.

In Count Thirteen of the original indictment (now Count Twelve of the superseding indictment), Defendant is charged with an offense under 18 U.S.C. § 1959, which is commonly known as VICAR. The basis for this charge, according to the Government, is that Defendant and others confronted a man in a bar for wearing a t-shirt expressing support for a rival motorcycle club. The man allegedly turned his shirt over to Defendant after he was surrounded and threatened with violence. Counsel for the Government stated that they believed Defendant threatened the man with a knife during the incident, but there was insufficient evidence of the use of a knife to charge him with assault with a dangerous weapon in aid of racketeering under 18 U.S.C. § 1959(a)(3). Instead, Defendant was charged in the original indictment with threatening to commit a crime of violence in aid of racketeering under a different VICAR subsection, § 1959(a)(4).

The original indictment was unsealed and Defendant was arrested on October 6, 2009. He appeared before Magistrate Judge Mary Stanley for a detention hearing several days later. At that hearing, Defendant's counsel attempted to use a number of photographs taken on the night of the alleged incident for the purpose of questioning one of the Government's witnesses. The photographs were not entered into evidence.

Lathey was called to testify before a federal grand jury on January 5, 2010. The subpoena apparently commanded her to provide the photographs in question. At the March 29 hearing, counsel for the Government was candid about the rationale for the grand jury subpoena issued to Lathey:

> So through defense counsel's representation in court, we thought that there were
> pictures taken on that specific night other than the one that we had already got from

9

> one of the people who was there. So obviously we thought that if there were a bunch of pictures that night, one of them might show whether the defendant had a knife or not and, if he had a knife, we intended to supersede with assault with a dangerous weapon in aid of racketeering. Oddly, there were 50 pictures, but none of them showed the right side of the defendant to see whether he had a knife or not. So after we got the pictures as they were subpoenaed, we still didn't feel like we should present an indictment for assault with a dangerous weapon because they didn't show whether or not the defendant had a knife. So if the pictures had shown that he had a knife, we would have superseded and charged him with a more serious offense. Because the pictures didn't unequivocally show that, we didn't. It's clearly a proper purpose to use a grand jury subpoena.

A superseding indictment was returned on February 2, 2010. There were a few minor changes to the VICAR count lodged against Defendant, but the substantive offense, § 1959(a)(4), was unchanged.

The Government's stated purpose for subpoenaing Lathey is analogous to a situation that came before the First Circuit in *United States v. Flemmi*, 245 F.3d 24 (2001). The First Circuit's reasoning is persuasive. The defendant in *Flemmi* initially was indicted on RICO charges. The grand jury continued to deliberate and call witnesses. A superseding indictment was returned which contained no additional defendants or charges, but which added four predicate racketeering acts to the existing RICO charge. The additional racketeering acts had the effect of increasing the maximum penalty for the defendant from twenty years to life in prison. The *Flemmi* court cited the principle from the Supreme Court's decision in *Apprendi v. New Jersey* that "any fact that increases the defendant's exposure beyond the prescribed statutory maximum 'is the functional equivalent of an element of a greater offense.'" *Flemmi*, 245 F.3d at 30 (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 494 n.19 (2000)). Accordingly, the court held that the increased maximum penalty in the superseding indictment was "a sufficiently substantial change to defeat an accusation of grand jury abuse." *Flemmi*, 245 F.3d at 29.

The *Flemmi* court prefaced its decision with the observation that "there is a fine line between an improper 'trial preparation' use of a grand jury and a proper 'continuing investigation' use." 245 F.3d at 28. The Government in this case treads closer to that line than did the prosecutor in *Flemmi*. Unlike *Flemmi*, the superseding indictment in this case did not increase the maximum penalty for Defendant. The substantive offense and statutory penalty remained unchanged. However, the pertinent inquiry must be focused on the Government's subjective intent in pursuing a continuing grand jury investigation. The contents of any superseding indictment is only circumstantial evidence of this intent. A superseding indictment that adds charges or defendants to the case is strong evidence that the grand jury was used for a proper purpose, but an investigation that does not produce new charges does give rise to the converse inference of impropriety. *Cf. Leung*, 40 F.3d at 581–82 ("[A] grand jury investigation is not improper merely because it does not result in formal charges.").

The Government's stated intent in this case was to find evidence that Defendant committed the VICAR offense by committing an assault with a knife. If such evidence had been discovered through the grand jury's subpoena of Lathey, the Government represented that it would have sought a superseding indictment to charge Defendant with assault with a dangerous weapon under § 1959(a)(3). This change would have increased the maximum statutory penalty for the offense from five years to twenty years in prison. Defendant has come forward with no convincing evidence that the Government's stated purpose for Lathey's grand jury subpoena was a pretense. Thus, assuming the Government's stated intent in utilizing the grand jury's investigatory powers to subpoena Lathey to obtain the photographs is true, the present circumstances are not materially distinguishable from those in *Flemmi*. The result should be the same. The Government's intent was to obtain evidence of conduct that would have permitted a substantial change to the charge against Defendant, namely a

11

significant increase in the maximum statutory penalty. The Court therefore finds that Defendant has not rebutted the presumption of regularity which attached to the grand jury's proceedings and has not demonstrated that the Government's sole or dominant purpose for the Lathey subpoena was to engage in improper pretrial discovery.

### III.  CONCLUSION

For the reasons set forth above, Defendant's Motion to Suppress Evidence [Docket 872] and Supplemental Motion to Suppress [Docket 1255] are **DENIED**.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to Defendant and counsel, and the United States Attorney.

ENTER: June 25, 2010

_____
THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE